UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

                                Case No. 16-20222

v.                            Hon. Arthur J. Tarnow

ELLIOTT COTTON,

     Defendant.

_____/

## United States' Response Opposing the Defendant's Request for Compassionate Release

The Defendant, Elliot Cotton, was involved in the distribution of
cocaine as part of a drug trafficking organization working in the
Detroit, Michigan area. Cotton mailed packages obtained from a source
of supply in California to the Detroit, Michigan, area. These packages
contained as much as 500 grams of cocaine at a time. In addition to
committing this serious offense, Cotton made numerous deposits of the
proceeds from the sales of controlled substances into the accounts of
coconspirators, who, in turn, used those proceeds to purchase still more
cocaine for distribution. Cotton was thus involved in both the delivery of
drugs, and the laundering of the proceeds of their later sale. Cotton
participated in this conduct for years, and was well into his adulthood –

1

his mid-50s – when he did so. Cotton was charged with multiple drug and money laundering offenses, and pled guilty to possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841, and conspiracy to launder money instruments, in violation of 18 U.S.C. § 1956. On June 13, 2018, he was sentenced to 60 months' of imprisonment.

Cotton began serving his current sentence on July 26, 2018. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of June 11, 2020, these

directives have already resulted in at least 4,010 inmates being placed on home confinement. *See* [BOP Covid-19 Website](BOP Covid-19 Website).

*Second*, Cotton does not qualify for compassionate release. On May 25, 2020, Cotton submitted an administrative request for compassionate release based on his purported risk of a severe case of Covid-19, but because 30 days have not yet passed, as required under 18 U.S.C. § 3582(c)(1)(A), Cotton's motion must be dismissed until such time as he exhausts his administrative remedies. *United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321 (6th Cir. June 2, 2020). Nor, in any event, does Cotton satisfy the statutorily mandated criteria for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Cotton's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Even assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Cotton does not have a condition that places him at higher risk from

Covid-19. And BOP's efforts at containing the spread of Covid-19 have succeeded as of the date of this filing in there being no confirmed cases of the disease at FCI Morgantown, where Cotton is incarcerated. Additionally, Cotton's offense and history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he is a drug offender and money launderer who persisted in his conduct for years. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release for these same reasons.

## Background

Beginning in 2012, Ronald Miller organized a group of individuals to assist in the receipt and distribution of cocaine. One of Miller's primary sources of supply for cocaine was Ramel Howard. Howard had contacts in California who supplied him kilograms of cocaine at a time. Howard assembled a small group of men to assist in packaging and mailing up to 500 grams of the cocaine at a time to locations around the United States, including the Detroit area. Among that group of men was Elliott Cotton. Cotton mailed numerous packages of 500 grams or more of cocaine to the Detroit area from California over a period of several

4

years. After the packages of cocaine were received and then sold, most

usually to Miller, in the Detroit area, Cotton and others would collect

the proceeds and deposit them at banks in the Detroit area into reputed

business accounts of Howard and another coconspirator, Jeffrey Moore.

Howard would then withdraw the funds in California, and the process

would begin anew, with cocaine being shipped, and proceeds collected

and deposited. Cotton participated in this scheme for several years,

with the most activity in 2014. At that time, Cotton was already in his

mid-to-late 50s.

Cotton was charged with multiple drug and money laundering

crimes. He eventually pled guilty to possession with intent to distribute

cocaine and money laundering. Because of the quantity of cocaine

involved, Cotton faced a 60 month mandatory minimum sentence of

imprisonment, but he was eligible for the "safety valve" under 18 U.S.C.

§ 3553(f) that would have allowed him to be sentenced below that

mandatory minimum if he agreed to proffer with the government.

Cotton declined to participate in that proffer despite being given

numerous opportunities to do so. He was sentenced to the mandatory

minimum term of 60 months' of imprisonment on June 13, 2018.

5

Cotton began serving his prison sentence on July 26, 2018, and is currently incarcerated at FCI Morgantown in West Virginia. He is 64 years old, and his projected release date is October 23, 2022. Cotton has no serious medical conditions, and no medical conditions that are recognized to place him at risk of a severe case of Covid-19, were he to contract the virus. Nevertheless, Cotton has moved for compassionate release, and claims that he has severe asthma, placing him at heightened risk of death during the Covid-19 pandemic.

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19

6

Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times. Efforts like these have so far succeeded in there being no confirmed cases of Covid-19 at FCI Morgantown where Cotton is incarcerated.

## B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4,000 federal inmates have been granted home confinement since

9

the Covid-19 pandemic began, and that number continues to grow. BOP

Coronavirus FAQs. As the Attorney General's directives have explained,

these home-confinement decisions have required evaluating several

criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease
> the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement
> would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the

Covid-19 pandemic far better than any other solution does. The Bureau

of Prisons cannot open its facilities' gates indiscriminately and unleash

tens of thousands of convicted criminals, en masse. It must focus on the

inmates who have the highest risk factors for Covid-19 and are least

likely to engage in new criminal activity. This is true not just to protect

the public generally, but to avoid the risk that a released defendant will

bring Covid-19 back into the jail or prison system if he violates his

terms of release or is caught committing a new crime. *See* 18 U.S.C.

§ 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-

confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not

11

place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Cotton's motion for compassionate release.

Cotton's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321 (6th Cir. June 2, 2020); *United States v. Raia*, 954 F.3d

13

594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Alam* at *6; *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). It is a claim processing rule, that, once invoked by the government, mandates dismissal of the motion. *Alam* at *6.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As

at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Cotton has not exhausted his administrative remedies.

The Court must dismiss Cotton's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days

from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020). The Sixth Circuit addressed the issue of exhaustion in *United States v. Waseem Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321 (6th Cir. June 2, 2020). It concluded that § 3582(c)(1)(A)'s exhaustion requirement is a mandatory claim-processing rule that, when invoked, requires the dismissal of a motion brought without having complied with the exhaustion requirement. *Alam* at *6. If the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf. *Id.* At *2-*3. To do that, he must "fully exhaust[] all administrative rights to appeal" with the prison or wait 30 days after his first request to the prison. 18 U.S.C. § 3582(c)(1)(A). *Id.* Failure to do so means a motion for compassionate release must be dismissed.

Under this binding precedent, Cotton's motion for compassionate release must be dismissed. On May 25, 2020, Cotton submitted an administrative request for compassionate release to the Warden at FCI Morgantown based on his purported risk of a severe case of Covid-19. As of the date of this filing, the Warden has not ruled on that request.

16

Even if the Warden had ruled, that is not the end of potential administrative remedies, which could include administrative appeal of the Warden's decision. Because 30 days have not yet passed since the initial application, nor has Cotton exhausted his remedies, as required under 18 U.S.C. § 3582(c)(1)(A), and because the government has invoked the rule in this response, the Court must dismiss Cotton's motion.

## B.     There are no extraordinary and compelling reasons to grant Cotton compassionate release.

Even if Cotton had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section

3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family

18

circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Cotton and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. And there are no confirmed cases where Cotton is incarcerated, FCI Morgantown, and so any risk of infection is attenuated.

Cotton's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when

considered in combination with the Covid-19 pandemic. The Centers for

Disease Control publishes guidance for what demographic and medical

criteria may put one at risk of a severe case of Covid-19. *See*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/groups-at-higher-risk.html. A review of Cotton's medical

records shows that he has not been diagnosed with any of these

recognized risk factors for a severe case of Covid-19. (*See* Exhibit 1,

2020 Medical Records, pg. 21 ("Health Problems")). Cotton is 64 years

old, still not quite the age of 65 noted by the CDC as the age at which

an individual's risk of a severe case of Covid-19 is particularly

heightened. So whether considered alone or in combination with the

Covid-19 pandemic, Cotton's age and medical condition do not satisfy

the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1.

*See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6

(E.D. Mich. May 15, 2020).

    In his letter to the Court requesting compassionate release, Cotton

pointed to his asthma, as well as other of his medical conditions, such

as glaucoma and gout. Cotton is correct that asthma can be a risk factor

for a more severe case of Covid-19, but, according to the CDC, it is only

"moderate to severe cases" of asthma that are such a risk factor. *See*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/groups-at-higher-risk.html. This distinction between the

varying degrees of asthma matters in the analysis of whether a

prisoner's asthma constitutes an extraordinary and compelling reason

for release. *See United States v. Collins*, No. 17-20360, Dkt. #104

(E.D.Mich. May 7, 2020)(denying compassionate release to a prisoner

with mild asthma and explaining the different degrees of asthma).

Cotton's medical records from BOP do not clearly state what degree of

asthma he has, but a review of what constitutes moderate to severe

asthma in comparison with Cotton's medical records shows his

condition to be under control and not to the level of either "moderate" or

"severe" asthma.

   As noted by Judge Lawson in the *Collins* matter, asthma is classified

into four categories based on how often you have symptoms and how

well you breathe. These categories are: mild intermittent; mild

persistent; moderate persistent; and severe persistent.

https://www.webmd.com/asthma/qa/what-are-the-categories-of-asthma

"Moderate persistent asthma" is characterized by daily symptoms, nighttime symptoms more than five times per month, and one's symptoms affect one's activity, happen more than two times per week, and may last for days. https://www.webmd.com/asthma/qa/what-is-moderate-persistent-asthma. Additionally, one's lung function tests are 60% to 80% of predicted values based on age, sex, and height. *Id.* Severe persistent asthma is characterized by having symptoms continuously, with frequent nighttime asthma.

https://www.webmd.com/asthma/qa/what-is-severe-persistent-asthma. Ones activities are also limited, and lung function is less than 60% of predicted values based on age, sex, and height. *Id.*

While Cotton characterizes his asthma as severe, none of the information before the Court at this time supports that suggestion. The PSR noted Cotton's asthma, but without elaboration. (PSR ¶ 47). BOP medical records show that Cotton has had three encounters with medical personnel concerning his asthma. On February 11, 2020, during a medical appointment at which his gout was the chief reason for the visit, his asthma was also discussed. (Ex. 1: 2020 Medical Records, pg. 5). Cotton described using his albuterol twice a week, just

22

prior to exercise or a cold wind. (Id.). Cotton also denied any nocturnal

symptoms. On March 6, 2019, Cotton complained of having issues

breathing due to grass exacerbating his asthma. (Ex. 2: 2019 Medical

Records, pg. 9). He was instructed to comply with use of his inhaler

medications as directed. (Id.). This appears to have solved the issues.

On August 6, 2018, Cotton's asthma was simply noted during the course

of a general physical, with no complaints concerning it noted. (Ex. 3:

2018 Medical Records, pg. 24).

Thus, there is currently nothing in the record that demonstrates that

Cotton has the severity of asthma that would qualify as a known risk

factor for a severe case of Covid-19. None of the BOP medical records

discuss Cotton's lung capacity, and the records show him to not have

the sort of nocturnal symptoms that characterize a moderate or severe

case of asthma.

Cotton also claims to have at one time been diagnosed with chronic

obstructive pulmonary disease. COPD is a kind of chronic lung disease

that *is* noted as a risk factor for severe Covid-19 symptoms.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/groups-at-higher-risk.html. But Cotton provides no support

for the assertion that he has this condition, and the medical records available to the government do not indicate that he has this disease.

Finally, even if the combination of Cotton's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Cotton would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). An evaluation of dangerousness under § 3142(g) also requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen

spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Cotton's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Cotton was heavily involved in distributing large quantities of cocaine, and did it over and over again. And he didn't stop there. Cotton also supported the financial side of this endeavor, helping to launder the funds through bank accounts of his co-conspirators. When presented with the opportunity to potentially lessen his sentence, Cotton declined to participate in a simple, limited proffer with the government that would have made him safety valve eligible. Cotton is an unrepentant, professional drug dealer, and there is little reason to believe that he will abide by the law if released.

Cotton is not eligible for compassionate release.

25

## C.  The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Cotton eligible for compassionate release, the § 3553(a) factors should still disqualify him for the reasons noted above concerning the nature and circumstances of the offense and his danger to the community.

### III. If the Court were to grant Cotton's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Cotton's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Cotton's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ Brant Cook
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9756
brant.cook@usdoj.gov

Dated: June 11, 2020

## Certificate of Service

I certify that on June 11, 2020, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

s/ Brant Cook
Assistant U.S. Attorney
